May it please the Court, Robert Friedman, along with Rekha Sharma Crawford, or Appellant Lt. Col. Patrick Schreiber. I'd like to reserve three minutes for rebuttal, if I may. You need to get a little closer to that microphone. Yes, Your Honor. Lt. Col. Schreiber seeks a visa for his daughter, Haybin, so that they can remain together in the United States, where they've built a family and built a life. Lt. Col. Schreiber legitimated Haybin under Kansas law, and in doing so, he bestowed on her the full rights that a child can have in relation to a parent. Because Haybin was under 18 at that time, that was sufficient to make her eligible for an immediate relative visa under federal immigration law. The agency, in a decision that the district court affirmed, denied Haybin that visa by imposing on the act of legitimating a biological requirement that does not exist in the applicable statute. The district court and the agency erred primarily by not following the explicit textual instruction to look to state law to determine whether a child has been legitimated. And if we look to state law, do you have a Kansas case in which a child was legitimated by adoption that was not a biological parent? I don't have a case with those facts, but Aslan v. Seaman states that as much in dicta and for purposes of determining. What case did you reference? Aslan v. Seaman. Aslan referenced as one means of legitimation adoption, citing a statute that was revoked, repealed in 1990. So that doesn't do you any good? Well, the statute has been repealed, but what is now in effect, so prior Kansas law referred to the concept of legitimacy, for the most part that has been removed from Kansas law. But if you look at Kansas statute section 592118 and Kansas statute section 232206, those while not referring to the concept of legitimacy specifically, do establish that a child who is adopted has all the full rights of any child. Why does that answer the question that's under the statute, the federal statute? I mean, I noted in Amicus brief in particular that they referred to the notion, and this is alluded to in your comments, that Kansas law has moved forward from the concept of legitimacy. Well, that's all fine and well, but the federal government, as awkward as it may be in moving to the right place, has not moved forward from the concept of legitimacy. And so you still have to talk about whether legitimated as a concept is applicable here. And I think for that, you'd look to the Kansas Supreme Court for how it would treat the concept of legitimacy or the act of legitimating under federal law. When construing state law, this court's task is to predict what the Kansas Supreme Court would do. And Aslan's statement has not been overruled or backed away from, so it's still sufficient for that purpose. And if you follow that guidance, then you get to the result that HABEN has been legitimated. But the district court never explained why it didn't even look to state law. It recognized that Lieutenant Colonel Schreiber asked the court to apply state law, and he did so because the statute refers to the law under the child's residence or domicile. You submitted some supplemental authority, right? Yes, Your Honor. And in that supplemental authority, that Fourth Circuit case, they referred to a case called De Silva, which is a Supreme Court case. And that case is talking about application of state law, and that was the thrust of why you were submitting supplemental authority, right? Yes, Your Honor. And De Silva makes it clear that yes, in domestic relations context, the federal government does look to state law, but the state law definition has to be consistent with, familiar, I think is the word they use, familiar with customary definitions that are accepted for the term in question. Well, the fact that Kansas has shelved the concept of legitimate and come up with something else doesn't mean that when interpreting a federal statute, at least that's what I get from De Silva, we still aren't supposed to try to find something that is a customary definition of legitimate. Do you agree with that? Well, I don't think that what De Silva was instructing courts to do was to look for a customary definition. You said familiar, so how would you interpret familiar? I think United States v. Little Lake, which we cite in our reply brief, clarifies what De Silva was getting at, and that is whether the state law principle or definition is hostile to the federal interest at issue, and the Kansas definition or the Kansas principle that we've identified is not hostile to the federal program here, the immediate relative program. But also, if you want to look at this as does anybody else define the act of legitimating without reference to the agency's strict connection to a natural parent, the agency itself does that in making an exception for non-genetic gestational mothers. The non-genetic gestational mother bears the child. The non-genetic gestational mother has a biological connection to the child. Lieutenant Colonel, he does not have that, and so they are not similarly situated. That's true, but the line that the agency has drawn or attempted to draw between biology and genetics doesn't appear in the statute, and there's no indication that Congress understood legitimated to refer to biology but not genetics. And so if you can carve out that exception for genetics, that shows that the strict definition that the agency is trying to impose here does not actually exist. Well, this so-called strict definition, if the underlying, agree with it or not, antiquate it or not, if the federal government is deciding that it matters and benefits the familial relationship, that there be a biological connection, you accept the notion that it could do that, right? Because there's adoption cases where the federal government and the amicus brief mention those, has drawn a line between a non-adopted and adopted aliens, and there is a question of biology at play in some of these statutes. So you accept the fact that the government could draw those lines, right? Yes, Congress could have defined legitimated itself. But it could say, it could adopt the view that for furthering immigration purposes, it is helpful for family unity that there be a biological connection between the family members. Yes, we don't dispute that Congress could have done it. We do dispute that Congress did do it. I understand that. And so, if you follow what we think is the clear instruction to look to state law, then you get to, Haben is Lieutenant Colonel Shriver's legitimated daughter. And that instruction makes sense, and we think there's a reason that Congress didn't define legitimated, as you're suggesting, Judge Holmes. And that's because the act of legitimating is a family law concept, and family law is historically and ordinarily left to the states, and there's a mode of analysis that is to be applied in those circumstances, the De Silva mode that we were discussing. And the case that you alluded to that interpreted De Silva and talked about hostility to the concept, well, the gist that I take, and I'm not saying that you have to own it, but the gist that I take from the amicus brief, and it's also the subtext of your argument, as I understand it, is Kansas said, we're putting legitimation out the window. We don't accept that concept. Well, why isn't that hostile to the concept that the federal government decided to accept? I mean, Kansas said, we aren't going to accept the premise of legitimation, and what we're going to focus on is other indicia of family unity. I mean, that's all good and well, they can do that, but we're not construing that, right? I think that Kansas made a decision to the best of its abilities to move on from the concept of illegitimacy and legitimacy because it views those concepts as discriminatory. But it has not entirely disregarded the concept. If you look at Kansas statute section 59-2136, that concerns, what do we do when somebody wants to adopt a child and we can't identify the father? The court is given the task of attempting to identify the father, and there are certain categories of people that it must attempt to find. One of those categories is any person who is a legitimate father or a legitimate parent, I don't remember the exact language, under our prior law or under the law of another state. So Kansas still knows how to identify the legitimate father. It has attempted to move on from what it's viewed as discriminatory terms, but it doesn't refuse to address that concept when it must be addressed. And in this case, it must be addressed. So we think the best guidance is Aslan v. Seaman, the Kansas Supreme Courts. The federal statute, subsection B1C, the legitimated provision, and then a few provisions down in E, it talks about adopted children under the age of 16. Doesn't that suggest that the statutory scheme treated legitimated children and adopted children differently? And if we allow adopted children to take advantage of the legitimated provision, that enables older children up to 18 to take advantage of the scheme. So my question is, why didn't Congress deal with adopted children in E and we're dealing with something else, i.e. biologically illegitimate children in C? Two responses. First, it's not our position that any adopted child could qualify under B1C, the legitimated provision. It's only when that child is legitimated under state law. And as we point out in our brief, there are a number of states that at the time the INA was enacted where an adopted child could not so qualify. There are also a number of foreign jurisdictions, we believe. But it's also within Congress's contemplation that these provisions would overlap. And the government does not dispute that they would overlap. I'm sorry, that they can overlap. And because Congress incorporated state law into this system of conferring immediate relative visas and because it's designed to track state law, Congress understood that there would be some shifting in the degree of overlap. And if you look at B1D and B1C, there's also substantial overlap there, or at least there's potential for substantial overlap. B1D refers to the natural father being allowed to obtain a visa for any child with whom the natural father has a bona fide relationship. Well, under B1C, in addition to undergoing the act of legitimation, you also need legal custody. Anybody who has legal custody is highly likely to have a bona fide relationship, and thus, if the person is the natural father, will already be able to obtain a visa under B1D in a large number of cases, thereby rendering B1C superfluous. So that type of overlap is inherent in the system that Congress designed because the system is intended to keep families like the Shribers together. And if I may reserve the remainder of my time. I have one question. Oh, excuse me, Chief. In regards to the question that Chief Judge Stimkov has just asked you, would the fact, or did you, or do you argue that you preserved your equal protection argument before us? Yes, Your Honor, for two reasons. The first, we believe that it was raised in front of the BIA, but even if this court determines that it was not raised under Darby v. Cisneros, a litigant only needs to exhaust mandatory intra-agency appeals. There's no dispute here that the appeal to the BIA was a discretionary one. So even if Lieutenant Colonel Shriber did not present it with sufficient specificity to the BIA, he was entitled to raise it in the district court in the first instance. He raised it at the first administrative level. He did not, however. Why doesn't that do it? I mean, if you didn't raise it there, and that is the place you know you had to go, you had to be there. Three responses, Your Honor. The first is that the USCIS determination, that's not in front of a lawyer. That's not a place where a constitutional claim is normally aired. It's not an adversarial proceeding. The second is that Lieutenant Colonel Shriber did not receive the agency's determination that he could not qualify as a child, sorry, that he then could not qualify as a child unless they shared a biological connection until the final decision. You knew about Mater Buono, didn't you? That case existed at the time, right? That would go to my third point, which is the government has not argued that Lieutenant Colonel Shriber should have been aware of Mater Buono. So the government, we think, has waived any contention that it should have been raised in front of the USCIS. And because exhaustion in this instance is not jurisdictional, that waiver should not preclude Lieutenant Colonel Shriber from raising it in the district court. And so we would, in addition to asking the court to rule in our favor on the statutory claim, remand if necessary on the constitutional claim. Thank you, counsel. I'll give you 60 seconds of rebuttal. Let's hear from the government. Good morning, Your Honors. May it please the court. Good morning. Team O'Neill Peoples here on behalf of the defendant's appellees. Well, counsel, you heard the benefit of the questions that we've made and the responses by opposing counsel. The last question that Judge Stemkevich asked is one of the ones that bothers me the most in regards to E and C and the differentiations of how a person under E gets certain benefits, even though the only exception being age. And so the first question I have is, has the equal protection as far as you see this record, has that been preserved before us? Your Honor, our position is that it hasn't been reserved. Has not or has? Has not. Okay. Please explain why. Well, the plaintiff's brief to, well, first off, plaintiff never raised the issue at all to CIS. That's undisputed. And did you waive that? I didn't see any reference that you challenged that as a basis for lack of exhaustion. Your Honor, we pointed out that it had not been raised to the CIS. Well, did you argue in front of us that that was a ground for lack of exhaustion? I believe the way it was phrased, I'll put it like this. I believe the way it was phrased is that we did point out that it had not been raised before CIS. But in any event, what's being challenged here is the BIA's decision. That's the final decision. And it's undisputed that it was not raised to BIA. So that's really- Well, it's clear by them that it was not raised in front of the BIA. And it's my understanding they're claiming that they preserved it in front of the BIA. The BIA, what they raised before the BIA was an equal protection argument based on state law, Kansas state law, and the difference between how Kansas treated children adopted in Kansas and how the government treated children adopted in Kansas. That was completely different than the equal protection argument that they sought to raise in the district court. And why did they need to raise it in front of the BIA at all? Because they did appeal to the BIA. They raised arguments before the BIA. And that's the decision that they are challenging here in this court. The APA does not allow them to come before the court and raise arguments they didn't give the agency an opportunity to consider. Again, we're not saying that they were required to appeal to the BIA, but they did. And that's the decision that they're challenging here. That's the final agency action. So it's not fair to judge the agency's action on grounds that weren't raised before the agency and the agency did not have a chance to consider. And it's notable here that there really is no reason that they did not raise that argument before the BIA. They raised a different one. Then they switched legal theories between the agency and the district court, and that type of surprise or sandbagging is really not permissible. So because they didn't raise the argument they sought to raise in the district court before the BIA, the court should not hear it now. The agency should have the opportunity to hear their argument in the first instance. Let me, if I may, just press a little bit further in regards to that. If for purposes of argument that we say that they did preserve that, then what is the legal explanation for the difference between the way that subsection E is drawn that gives the benefit simply by age as compared to how, and I'm referring to this E and C, it's too long to remember otherwise, where it really gets into this question of the biological father and all of this, which seems to me to be somewhat concerning and unfair. Well, Your Honor, I will point out that the legislative history regarding C is very limited. The district court noted that. Yes, but that still doesn't give an explanation of why if I happen to be under 17 or 16, I don't have to go through all of that, whereas if I happen to be 18 or older, then my connection has got to be with a biological father. Your Honor, I don't have an answer for that. All I can say is that that's what Congress has provided for, that those are two different sections and that they pertain to two different subsets of children and that there are different age limits in both. The age limit under C has been 18, I believe, since it's an enactment for E dealing with adopted children. It was initially 14, I believe, and then it was raised to 16. So that is a question for Congress. Your answer is the very dilemma that I've been wrestling with, and I thank you for that. But, Your Honor, that should not affect the analysis here. I'll go ahead and do your argument. The theme here is really just that plaintiff is trying to fit into a provision that simply doesn't fit. That's really what it is. Subpart C deals with legitimated children, and if we look at the statutory tools of interpretation, legitimated has a plain meaning that requires a biological component. Except the premise that we should be looking to state law to determine that concept of what legitimated means? No. The way that the agency looks at it is that it's a two-part test. So the first part is the biological requirement, and then you look to the state law to determine how the state legitimizes that biological relationship. So you look to state law only for the procedure of legitimation? Yes. In other words, the federal government determines who can legitimate, and the state determines how the legitimation occurs. How is that consistent with both the Fourth Circuit case and the Supreme Court case, the De Silva case, where De Silva talked about the notion that this is not a domestic relations area that the federal government covers, and we look to state law? And they look to it for a word that, well, I think the Fourth Circuit word in question was, I forgot what the word was. It was physical custody. Physical custody, and that seems to me that that's fairly analogous to what we're talking about here. It's a concept, and it's a concept of familial relationship. And so why, if we're not looking to it there, we're looking to state law there, why aren't we looking to state law here? Well, I will point out that De Silva really just stands for the proposition that a state should not be allowed to use a term in a way that is entirely strange to its ordinary usage. That's the second part of it. The first part of it, that only makes sense if you accept the first part, which is you're supposed to be looking to state law to begin with. Well, the court there did acknowledge that the question of who was a child was one of federal law, but it reasoned that because there was no federal law of domestic relations, then turned to state court. But here we have a term that has a plain, ordinary meaning that has an inherent biological requirement. Physical custody has a plain, ordinary meaning, too. Well, in that case, that deals with Duncan. And to be honest with you, there really is no analysis that the court undertook there. It simply said that since Congress hadn't defined the term, it would look to state law to determine the relationship. Whatever the term was in De Silva, the point is still the same. I mean, it appears on its face to be a vanilla term, but it's a term that arises in the context of domestic relations. And De Silva and Duncan as well look to state law to make that determination. Let's just posit, okay, I'll accept the premise that you're following federal law. Let's accept the plain meaning of the language. Let's accept the premise for the moment, assuming that we are under Kansas law. How do we go about analyzing? Let's say the default is that we look to Kansas law. How do we go about analyzing this case? Well, again, the first part is determining is there a biological relationship. That's number one. That's not what Kansas law says. I'm saying if the starting point is the default of looking to Kansas law, what do we do then? Well, then this agency would look to the requirements of the state law to see if they were fulfilled, if legitimation had occurred under the state law. If Kansas has abandoned the concept of legitimacy, which appears to be the case, per the amicus brief and per looking at the Kansas statutes. If Kansas says we're moving away, except for the one exception that was given by co-counsel, we're moving away from this pejorative concept of legitimacy. If they're moving away from that and they've abandoned that, and our default is first to look to Kansas law, then what do we do? Well, Your Honor, again, I think the approach then would be that that's improper because that's Kansas law, and the state can't read out of a term an inherent requirement. It's up to the federal government to determine whether or not the standard is met for the federal immigration purpose. And none of the cases that plaintiff cites really allow the state to do that. We're talking about an area of law that has historically and traditionally been reserved exclusively to the power of the federal government. And here Congress can set rules and requirements for nationalization for immigration, and it can impose those requirements. No state should be able to come in and usurp that requirement, and that's essentially what plaintiff seeks to do here. I mean, again, I will point out that no case that plaintiff has cited where legitimation, within the context of the INA, has not required a biological component. Miller v. Albright, Scales v. INS, Salinas v. Espinoza, John v. Sessions, Martinez v. Madeira, Rios v. Civiletti, all of these cases recognize that legitimation has an immediate biological requirement, that a child born out of wedlock is illegitimate and therefore requires a natural parent in order to legitimize the relationship. The only case that deals with this provision specifically is De Los Santos, and there the court found that legitimation was a question of federal law. It did deal with a different issue, but there it looked at the exact language that we're confronted with today, and it said that it is a question of federal law. It reasoned that state laws were designed to deal with inheritance rights, and so therefore it really didn't make sense to turn over the question of who was a legitimate child completely to the states because it dealt with a different issue. And so the approach we're here today, again, we're not ignoring the state law, but what we're saying is that it's a two-part test and that the first part must look at the biological relationship. In other words, who can legitimate? And the second part looks at state law to determine how that process and how that relationship is legitimated, and that's perfectly acceptable. Why does that state process matter? I mean, I see your who and how analysis, but why is the how particularly significant in understanding the statutory scheme? Well, because the statute says that the child is legitimated under the law of the child's residence or domicile  So Congress did want to give effect to those states where the child resided or the father of the child resided, and we're not disputing that, that you look to state law to look at those requirements, but you still have to impose the violation. But why would you need the phrase under state law? Why wouldn't, under your interpretation, the statute just be legitimated, et cetera, et cetera? Well, then it may be a question as to what law would control, and it would control the process. And so, I mean, it could have read the child legitimated under the law, as that term is defined, under the law of the state, et cetera, et cetera, but it doesn't. It says legitimated under the law. And so the district court reasoned that by placing legitimated before that phrase under the law, that it meant that legitimation, that the question of whether or not a child was legitimated, could not solely be answered by resorting to state law, and that we support that interpretation. Is this an easier or harder case if we view the term legitimated to be ambiguous? I'm sorry? If we view that term to be ambiguous, is this an easier or harder case for you? The same analysis we find supports our interpretation of Chevron Step 1 or Chevron Step 2. But if it's under Chevron Step 2 and you find that it's ambiguous, then matter bueno is a perfectly reasonable interpretation of the term. And there the court, the BIA, looked at the common and plain ordinary meaning of the word, the fact that it had been consistently interpreted over time, and also this court's decision in Fifer v. Wright back in 1930, which also supports our interpretation of the term. Under the APA, I mean, the standard is extremely deferential to the agency, and the court, in order to reverse the agency's determination, would have to find that no reasonable fact finder could find in favor of the agency. That's an extremely high standard, and especially based on this record where you have the plain meaning, the legislative history, numerous cases that support our interpretation. So we feel that the district court's decision should be affirmed. The agencies correctly determined that the visa petition simply could not be granted. And as fortunate as it is, we are not unsympathetic to the plaintiff's situation, but the agencies must enforce the text as it is written. The legitimate is not defined in the statutory scheme. Where's the definition that you're going to tell me to go read that supports your ultimate conclusion that a biological connection is mandatory? Well, you can look at the dictionary definitions and the contemporary meaning of the term, which is what the district court referred to, definitions of lawful birth, birth in wedlock, obligations by birth. You can also look at the 1946 State Department regulation that was the inspiration for Subpart C, and there that regulation had language that said that an illegitimate child could only be legitimated through his father. So there are numerous contextual references here that impose the biological requirement. Some dictionaries, though, talk about a restoration of status that doesn't seem to envision any sort of biological notion. Do we ignore those, or what do we do about that? I think as the district court noted, there are some dictionary definitions that don't impose or suggest a biological reference, but the majority of them overwhelmingly do and refer to birth and being born in wedlock, which infers a biological requirement. If there are no further questions, we'd like to rest on our brief. Thank you, Your Honors. Thank you, Counsel. Sixty seconds for Mr. Friedman. Thank you, Your Honors. I'd like to raise three points quickly, if I may. The first is that Duncan v. Barr is clear that you do not draw a line between what a family law term means and the process by which it's established. Duncan specifically says we're going to look to state law to determine, quote, the meaning of physical custody. The second is that the agency's decision in matter of Bueno, which articulated this general prohibition on recognizing non-biological legitimated children, is not due deference. It did not cite a number of cases establishing that there's a biological component. The cases it cited were about whether you need to confer full rights on a child or something less than full rights. So you're saying it's unreasonable, matter of Bueno? That is one of a number of reasons. Well, that would have to be the big one under Chevron Step 2, right? That is a big reason. We think it's unreasonable. It doesn't cite anything for this specific proposition. The many cases that Counsel listed also do not address this specific issue. I see that I'm out of time. Go ahead and finish your point. Okay. And quickly say another strong indication of the arbitrary and capriciousness of the agency's rule is the high similarity between this case and the general prohibition on non-protonic orders. The last thing I'll say is that the legislative history in this case, as we know in our brief, is not particularly illuminating. It's not about this specific provision and about the biological requirement. But if you want to draw something from the legislative history, the regulation that counsel relies on referred to illegitimate children, that was not carried forward into the actual statute that was enacted. Counsel, we appreciate the arguments. That was helpful. Counsel are excused and the case shall be submitted. And we'll take a short break.